The next argued case is number 15, 1975 in Re Van Os, Mr. Rosencrantz. And I'll make the same challenge. Can you do this orally without waving your hands? It is literally impossible. I've got this exhibit right behind me. So may it please the court, Josh Rosencrantz representing Apple. Your honors, this case presents procedurally a variation on the companion case, which is to say that in this case, one of the fundamental battlegrounds is the reason to combine. And both the PTAB and the examiner gave us one word on motivation to combine, intuitive. That is procedurally wrong. Even now, the PTO gives no reason to combine these elements. And it is also flatly wrong. So remember that this was 10 years ago. Apple did two things that the prior art had never done. The first is with regard to interface reconfiguration. It was interface reconfiguration. Can I ask a question real quick before you get into it? So your argument is that the word intuitive doesn't give us enough information. There's no because. And I think you're on good ground. Like even in KSR, when the Supreme Court said common sense, it was common sense because it would be more efficient to do this. Common sense because people in the art were trying to reduce the time it took to do this. Common sense because. And here we have no because. We just have it's intuitive, which means instinctive. I don't know. That doesn't differ in my mind from it would be obvious, which clearly would not be enough. This is me being helpful. So anyway, this is the part where I'm not going to be helpful. So I'll just telegraph the whole thing for you. So my question is, if the PTO didn't do enough, and you're about to tell me why it wouldn't be intuitive, that seems like a fact finding that I don't really feel comfortable making. The PTO gave us no reason why it would be intuitive. And if you're going to give me all the reasons it wouldn't be intuitive, are you really suggesting that I can make that decision in the first instance? So Your Honor, I actually treat that as a helpful question. So the fact finding in this case was intuitive. The PTO didn't offer any facts. And there are no facts on this record beyond the. Well, thus I can say that fact finding has not been supported by substantial evidence in the record. Exactly. But I can't go necessarily the other way and say one couldn't conclude that it was intuitive, for example. You want to take me back 10 years and have me start assessing whether I think it would be intuitive or not. That doesn't feel like something I can do. Your Honor, I'm happy to go back 10 years. But let's just talk about the burdens and the record in this case. The examiner had the burden. The examiner is supposed to produce the evidence of obviousness, of the reason to combine. The examiner did not produce that evidence. All we have are the two prior art references, mixing together two embodiments in one patent and then another patent. So this court reviews records. There is no substantial evidence this court can look at the prior art references and see that they contain no teaching. There's no reason one would have taken those prior art references. I can't look at the prior art references and decide whether they contain a teaching on motivation to combine. That's a fact question, Mr. Rosenkranz. I can't do that on appeal. I understood, Your Honor. PTO only gave me intuitive. I can't go line by line through these references and go on a hunt for my own motivation to combine. Fair enough. So then the question is, does the court send it back? Or does the court just say, look, we've got a record here. On this record, there is no substantial evidence. No, but that requires me to go line by line to determine whether there is substantial evidence in the record for a fact finding that nobody made. Or, Your Honor, go to the- Except that we can look at the finding about Gillespie. Because the PTAB found Gillespie teaches something. The PTAB found Gillespie teaches one of the elements. The PTAB was wrong. I checked and he kept using the interface. Yeah, I'll get to that element in a moment. The PTAB was wrong about that element. But it never said, here's how a person of skill in the art would know to combine that element, which was itself a combination of two embodiments, with Hawkins. And so just to finish the response to Judge Moore, this court is presented with records. There is no evidence that even now that the PTO points to in their brief, forget about the prior art references. The PTO is still in its brief. It's now had 50 pages, or up to 60 pages, to explain what the motivation to combine is. And it still hasn't done it. But let me explain to you why the PTAB failed to do it. It's because you simply can't point to anything in the prior art, at least the references before this court, that would lead you to the reason to combine. And again, this is going back 10 years. I was saying before that there were two things that the prior art was teaching that Apple did differently. The first was, if you were going to let a user reconfigure an interface, so move everything on their interface around, you hid that ability behind clunky menus and or physical buttons to make sure that you didn't inadvertently and perhaps catastrophically completely reconfigure. And secondly, if you were going to allow someone to do that on an interface with a mere touch, you would not use the same touch, just a bit longer, as the single most common touch that you use to interact with your smartphone. Apple did that first. And I want to underscore what this reconfiguration mode is. This is not just any action on any device. It is a reconfiguration on a mobile device. Reconfiguration is different from any action that you take on your phone, precisely because, especially when you're talking about a touch-sensitive device, reconfiguration could take your to-do list and your podcasts and either delete them entirely or banish them to a spot from which you will never find it. And it's not just reconfiguration. It's reconfiguration on a phone that you'd use with one hand, and you walk with your child in the other hand, and you can really accidentally completely refigure. So Apple figured out a way to say, you know what? We are OK not putting everything behind clunky menus or physical buttons. We can accept the possibility of a little bit of inadvertence in service of much greater user flexibility. So finally, Judge Wallach, to Gillespie. So Gillespie does not teach what the P-Tab says it teaches. Gillespie is the most oddball of inventions. It is a laptop, a normal laptop. It's got a touch screen down here that is used as a trackpad. So this is like your mouse, but it's also a touch screen. And the touch screen has icons on it, which is very weird. So it looks like this. OK, so here's the little trackpad. The problem Gillespie was trying to figure out was, how does the laptop know whether you're using this as a mouse and tapping to click on things on your screen, or using it to launch the icons that the user can see, but the icons can't see you unless they're activated? Gillespie gave two ways to do it. They are distinct. Paragraph 71 and paragraph 61. Neither of those involves a sustained touch. So one does. 71 does. So here's 71. 71 says, go and use your trackpad as a mouse. Click to your heart's content. Nothing will happen to these icons. When you do a sustained touch on the envelope, email opens up. No reconfiguration. You just launch the email app. Completely separate paragraph, 61. Different embodiment. I'm sorry, because I misspoke. It doesn't teach reconfiguration in response to a system. It does not teach what I would call an element, which is sustained touch to launch reconfiguration. It absolutely doesn't. Neither does 61. Does Gillespie even have a reconfiguration mode? It does. Paragraph 58 tells you exactly how you reconfigure. What do you do? You go behind a clunky menu to the software control panel. So you go on the laptop. And that activates the software control panel. But let's talk about 61, because 61 is what the PTO is combining with 71. So it's taking the sustained touch from 71. It's moving it down to 61, which has no sustained touch. 61 says, use this as a mouse to your heart's content. Click wherever you want. If you want to launch an icon, you can't do it from the mouse pad. But what you can do is go to your laptop, hit a button, and that will change it to active mode. All of a sudden now, this is no longer a mouse. Every time you touch, not sustained, but any touch, on an icon is the launching of an icon. And paragraph 73 warns, don't use multiple different ways to go into this activation. Now, what is fundamentally clear, what is fundamentally I'm a little bit confused. What is missing from 71? I looked at the PTO's argument, and I'm sure you'll tell me why I'm wrong, as really relying on the sustained touch of 71. And then its reference to activated being explained by paragraph 61, as once it is activated, then the icons become functional and can be dragged or moved around the screen. How is that different from the reconfiguration element? I'm not getting why you're arguing that Gillespie doesn't disclose it. What am I missing in your argument? So there are two things, Your Honor. The first is 71 teaches a sustained touch to activate this icon. The ability to move the icons around the screen. No, no. Yes, it references 61 expressly. And 61 says to activate, you can move the icon around. No, so I would say no to both. First, 71 does not allow you to move anything around. Paragraph 58 is what tells you how to move things around. Paragraph 61 doesn't allow an interface configuration mode where the user gets to move things around. Paragraph 61 is a toggle switch between two states. The two states may have different reconfigure, excuse me, the two states may have different configurations. But the second state is. So let's just, you know what, your rhetoric is great, but why don't you pull out Gillespie? Because I have to give this fact-finding substantial evidence deference. And so as persuasive as you may be about what you think it does or doesn't disclose, let's look at the actual language, and then let's keep in mind the deferential standard of review for this disclosure. So paragraph 71 has a sustained touch which triggers activation function of the icon. It says it right there in paragraph 71. Then you can look at paragraph 61, which is what the office also cited. And it says there's activated and unactivated states. And existing icons could also be removed or rearranged. Yes. And this is during the activated state. No, never says during the activated state. So let me explain, your honor, what 61 does. OK, you say it doesn't say during the activated state. I certainly actually read it that way, number one. Number two, the PTO made a factual finding that it said that. And that factual finding is entitled to substantial evidence deference. So you've got to convince me why not only is my reading wrong, but their reading is not supported by any evidence. Keep in mind that 61 illustrates the same set of icons in the activated and unactivated state. Yes. So here's what 61 explains, and first looking at the language. However, activation of the touch screen could also create additional icons. So you're touching the button to activate the touch screen. Additional icons will show up. It is a fixed state. So I'm now going to show you what paragraph 61 describes. It says additional icons could show up. It gives what seems to me a laundry list of things that could happen when you activate. They could show up. They could be removed. They could be rearranged. So this is an illustration, just one example. This is not a figure in the patent itself. But here's what it's describing. It's describing toggling between one state and a different state, where the icons are then reconfigured. So there are fewer icons. They can move. But it's a steady, fixed state toggled back and forth. If you want to know how to move the icon, nothing describes the user moving the icon. This is not an interface configuration mode in which the user then moves things around. Paragraph 58 explains how the user moves things around. How does the user do it? The user goes to a menu. And then Gillespie is totally fine with users consciously moving the icons around. But you will find nowhere in Gillespie, 71 or 61, the ability to enter into a mode where things are moved around at the instance of the user once you are in that mode. Can the PTAB rely on 58 saying, the only example it gives is a software control panel? Well, it says possibly using a software control panel. But it doesn't teach. It doesn't teach anything other than this. It doesn't teach anything. So the answer to your honor's question is first, the examiner didn't rely on it. The PTAB didn't rely on it. 58, if anything, teaches a way. It says, if the person of skill in the art is reading this patent, the person of skill in the art says, what do I do to reconfigure? Well, 58 tells me what I do to reconfigure. If I want this state to have different icons in different places, I go to a software. It clearly doesn't have the idea. That is correct. The author or the inventor has no idea and doesn't want users using their fingers to reconfigure. He wants users going behind to a menu to reconfigure. And again, yes. What is the precise reconfiguration element? And precisely what claim does it appear? So I can read the language. OK, so let's start with claim 38. So there is a. Yep, I've got it. We're reconfiguring. I think the easiest place to see it is the second to last paragraph. So interpreting the detected second longer, so that's the sustained touch, as an input, initiating an interface reconfiguration mode. So you need a long touch to get into a mode. And what do you do in that mode? Next paragraph. When you are in that mode, you engage in a second movement. That is the movement that moves things around. But you have to be in the mode first. And that's done with a sustained touch. And then, only then, are your icons in a position where you can move them around. Gillespie doesn't teach anything like that. And Hawkins, to the extent that you move things around, the way you enter it is not a sustained touch. It too hides it away on a physical key. If there are no further questions, I'll reserve whatever time remains for rebuttal. I will just speak. We do have rebuttal time. Thank you, Your Honor. Let's hear from the office. Mr. Lucilla. May it please the Court. Before addressing the arguments made by counsel for Randois, I think it's important to briefly clarify the context in which this appeal rises. The board determined that the vast majority of claims presented in this case were patentable. Importantly, these claims all require the additional feature of simultaneously varying the position of the icons, for example, to make them appear like they're floating on the screen when a predefined user interface reconfiguration process is initiated. It is this- How they allowed the claim because of the wiggle limitation? That's right. Okay. But the claims before this court do not have this limitation. And they broadly claim known finger gestures. You mean that just to make sure everybody understands what you mean by wiggle, it's like when you push your finger on your iPhone icon and hold it there and how the thing starts jiggling. That's correct. I just want to make sure we're all on the same page. That's correct. But the claims at issue in this case do not have that limitation. Instead, these claims are much broader. They claim known finger gestures in the prior art, such as a sustained touch of an icon to accomplish the same features that are taught in the prior art, including allowing a user to rearrange icons on a touch screen, including by dragging them to a new position on the touch screen. Counsel for Van Nuys repeatedly criticizes the articulation of the obviousness rejection by the examiner and affirmed by the board in his argument before this court. That takes us to the universal question and is the question of law. Is the motivation to combine why do we select this piece from this prior art, perhaps another part of the same reference, plus another reference, and put them together? So the examiner tells us it's intuitive. I don't know that as a word whose legal significance has been established. So let's just stay with the reasons to combine that we understand. Yes, Your Honor. So I guess. The point is to where in the record other than the word intuitive, the examiner or the PTAB identify a motion to combine the elements from the prior art. And I will certainly answer that question, but setting the table with that briefly is that it's important to note that counsel for Van Nuys did not argue that there was some problem with the examiner's articulation of the motivation to combine below. I don't think that's a fair statement. This is what this case is about. Well, I say that just to explain that. It's not surprising then that the board did not feel the need to provide any more verbose explanation of the word motivation to combine. But so pointing, it's important to look at the full record of the motivation to combine. It was not just the word intuitive way in a vacuum. The examiner, what the examiner found was that, apologies, in particular that Gillespie's technique of entering a user interface reconfiguration mode in response to a user sustaining a touch in proximity to an icon displayed on the touch screen would be the intuitive way for users of Hawkins' device to enter into the editing mode in which they could rearrange the icons corresponding to the applications on the interface. In other words, what the examiner found was the very nature of the finger gesture, placing your finger over the icon or close to the icon to initiate the. And holding it down. And holding it down, as taught in Gillespie, combined with the same finger gesture taught in Hawkins, holding your finger on an icon and then dragging it across the screen to reconfigure the user interface, it would be simply intuitive to just marry those two finger gestures together. That feels like an awful lot of hindsight. Why would it be intuitive to choose Hawkins necessarily with Gillespie, which isn't really, I mean, this is portable electronic device. I mean, these two references are not really, it's not like we're looking at two smartphone references side by side. These references are different from each other. So why is it that it would be so intuitive to take this element of this one and this element of the other one? It really feels like you said, it would be obvious to do it. That's why. It's obvious because it would be obvious. That's what intuitive means to me. I don't know another definition, so I don't know the because. I need the because. I believe that the examiner and the board found that Hawkins teaches all of the aspects of Claim 38 and Claim 40, except for the sustained second touch. They looked to Gillespie just merely as an example. Gillespie teaches that it was well known in the art to use a sustained touch next to an icon to enter a mode that reconfigures the icons on the screen. In the red brief at 22, you say, in the examiner's words, repurposing is exactly what Gillespie teaches. And you're quoting from 2147 in the record. And in the gray brief, Apple responds that the PTO mischaracterized the statement by implying it was a finding of the examiner when in fact it's from the examiner's brief before the PTAB. So I wanted to give you a chance to tell me where in the record the examiner makes that finding. Sure, the examiner made that finding in on page A2062 to 2063. I get it in front. So that's where he discusses Gillespie's teaching detecting a first user touch on a touch-sensitive display. For example, a touch screen as discussed in paragraph 36. The first user touch of a duration and at a location approximate to a first icon of a plurality of icons. And then more importantly, jumping down to the detecting a second user touch on the touch-sensitive display. The second user touch of a second duration longer than the first duration and at a location approximate to a second icon of the plurality of icons. For example, holding the finger steady over an icon for a given duration as discussed in paragraph 71. And then interpreting the detected second longer user touch as an input initiating an interface reconfiguration mode. And then he points to paragraph 61. You're confusing me. I'm looking for the words repurposing is exactly what Gillespie teaches in the examiner's words. The examiner did not use the word repurposing per se. That was what Apple, that's how Apple characterizes the actual claim language. The examiner looked to the claim language and found all of the limitations and elements in the prior art. This repurposing and dual role are monikers by account. I'm not reading from Apple's brief. I'm reading from yours. Well, so what the examiner did in the examiner's answer, he explained, he put his factual findings in context of the arguments provided by Apple in its opening brief before the board. So while, so the Apple challenged the examiner's findings that there was a second sustained touch and that second sustained touch would then initiate a user interface reconfiguration mode. And the examiner pointing back to his findings of paragraphs 61 and 71 in Gillespie, say that's what that teaches. It teaches a sustained second longer touch that initiates a user reconfiguration interface. And that is what Gillespie teaches in paragraph 71. That's correct. Okay, so one question you said a few minutes ago before you started in response to Judge Wallach's question, when you're answering mine, you said Gillespie demonstrates that it's well-known in the art to have a sustained touch. Where does Gillespie demonstrate that? I don't think I'm paraphrasing you. I think you said well-known in the art. I mean, paragraph 71 discloses it. And so certainly it is in this piece of prior art, but do you see that there's a difference? When I'm trying to think of a motivation to combine, plucking one element from one reference in a shoebox in the basement of a chemistry library in Germany and taking one of its elements, how does that demonstrate it's well-known in the art? So if you look at paragraph 70, the language immediately preceding paragraph 71 in Gillespie talking about the activation state of the touchscreen, Gillespie teaches that numerous other activation mechanisms are well-known that could serve for touchscreen activation, such as finger motion gestures. Now, the following paragraph, paragraph 71, is then a list of known finger gestures, one of which is holding a finger steady over an icon for a given duration. So Gillespie itself teaches that it was well-known that you could hold your finger over an icon for a steady duration in order to- He says that many methods are well-known. The focus is now this particular method in combination with everything else to achieve a result that, I think we all agree, neither of these references by itself achieves. So the examiner tells us it's intuitive. That's very interesting because there was a time gap in all of the other circumstances that intervened. I think that, as I stated before, the fact that the examiner found the same finger gesture which places the finger in the same location to both initiate a user reconfiguration mode and to drag, in Gillespie, and to drag the icon across the screen and reposition it in Hawkins, the very nature of those finger gestures and the placement of them at the same location provides the bridge to marry those two things together and make it a predictable and an intuitive way to combine those pieces of prior art. It just seems conspicuous. The examiner shows no teaching to combine, no suggestion to combine, no motivation to combine, and to bring it up to date with KSR, no common sense to combine. And so we have a new criterion of obviousness that's intuitive to who? To the examiner, in retrospect, or? No, I mean, I don't believe that that is correct. I think the examiner did make clear that he was talking about one of ordinary skill in the art at the time of the invention, and- But where are all these buzzwords, all these words of art that have appeared in thousands of decisions are missing? We have something new, some new concept that's somehow untethered from history, but nonetheless intuitive. And again, intuitive, if it's to be intuitive to persons of skill in the art, one would think that there would be some support for that. Examiner doesn't say, he says it's intuitive. Again, I think if you look back then at the actual factual findings made by the examiner, that puts context to the examiner's use of the word intuitive in this case. What the examiner was saying was that user's touch was an intuitive, that the user touch that was described in Gillespie was an intuitive way to- What does intuition mean in a legal sense? I'm not sure if I have a legal definition of- But I think what it means is- That's your word, you must be sure. In this case, I think it means, in this case, I think it means, I think it means predictable and common sense. And so- Really, I thought intuitive meant I know it even though I can't explain it. That may be one definition of the word, but I don't believe that that's what the examiner was saying in his answer and then the board saying in its decision. Extraordinarily difficult. It goes through the examiner, it goes through this entire appeals process, goes through the solicitor's office with no attempt to explain in terms of, in terms that we're used to the criterion here for obviousness of a combination whose result, whose product is not in the art. I do believe that in this case, as the director pointed out in the red brief, there are statements in the prior art, for example, that designers of these interfaces should avoid overly complex uses of finger gestures. I think counsel for Venice cited that in his opening argument here. Those things do provide the roadmap for the obviousness and intuitive motivation, motivation to combine provided by the examiner and the board in this case. So I do believe that there are things in the record that do support the examiner and the board's finding of motivation to combine and that it would have been intuitive way to use the same finger gesture in the same location in the same way. I also wanted to make one point before my time ran out. With respect to figure four of Gillespie, counsel makes much of the moving around and appearing and disappearing of the icons here, but I just wanted to make sure that everyone realized that the examiner and the board relied on Hawkins. Hawkins for the movement of the icons. That's correct. So Gillespie was just the sustained finger touch. That's correct. That's probably my fault. I sort of took him down that road a little bit, although he did bring that giant board. So I kind of think maybe he wanted to take us down that road. I appreciate that, but I think in the end, it does not get counsel for Venice very far because the board and the examiner did rely on Hawkins for the, to teach the dragging of the icons. And there's no dispute that Hawkins teaches that dragging. That's correct. Any more questions for Mr. O'Sullivan? One more question. Thank you, Mr. O'Sullivan. Mr. Rosenkranz, let's raise your at three minutes. Thank you, Your Honor. Just a couple of things on the merits and then the procedural questions. So on the merits, it's worth looking at paragraph 73, which is the only additional fact that the PTO has pointed to for motivation to combine. Paragraph 73 in Gillespie says, there are any number of ways to get into an activation state. Please, whatever you do, don't combine them because it confuses the users. So don't have this kind of activation this way and another kind of activation on the screen. It says activate in one way. It most certainly doesn't say don't use clunky menus because paragraph 58 teaches. Actually, it doesn't say what you just said. What you just claimed it says is don't use multiple ones. It discourages the use of multiple ones because they can cause confusion, but then says multiple different special functions should be used with caution because of the likelihood of causing confusion. So it doesn't say don't use them. It says use them with caution. There's a big difference between telling someone not to do something and telling someone be careful when you do it. My children would come here and make it very clear to you that they understand when mom says they can't do something as opposed to when they need to be careful when they do it. Understood, Your Honor. My point is it certainly doesn't teach you that you should combine. It says be careful not to combine or be careful when you combine. Right, that's the difference, right? Yeah, understood, yes. But my point is it's not teaching you that you should combine. And that's the only thing that the PTO has pointed to. It had 14,000 words to supplement what the examiner and then the PTAB did, and it still hasn't told you what the PTAB could possibly say on remand that would provide the missing motivation to combine, the because. And so the question ends up being- But maybe the because could be what the PTO attorney pointed to in paragraph 70 where, and granted, none of this is in their opinion below, so it's certainly not a basis upon which I confirm, but the well-known nature of the finger gestures. And I do recall KSR saying something about the predictable use of well-known functions, not, and I have this quote readily in my mind because it's not just in the same art, but even across arts. Right. And so if the only thing that came from Gillespie was a sustained finger touch, and if Gillespie's telling us it's well-known, and if Hawkins, if you're gonna apply it in Hawkins, in a very predictable way for a well-known finger touch, I guess the record doesn't convince me that it's not possible for the PTO to establish a motivation to combine. Your Honor, Gillespie is not- In fact, I think he's argued it. The Gillespie is not being used just for a sustained finger touch. It is being used for the element that the PTAB and the examiner both acknowledge was missing in Hawkins, which is a sustained finger touch on an icon in order to activate, initiate reconfiguration mode. No one was doing that. So simply saying, come on, everyone knew that there's a difference between a tap and a touch doesn't mean that there was a teaching that on a very accident-prone device, you're gonna use the same gesture, that is the most common gesture you use to launch icons, just a little bit longer in order to enter this activation into this reconfiguration mode. So just a moment on the remedy, if I may, because the question then is remand versus reversal. Now, this court reversed in In Re NTP. It reversed just last week in In Re Magnum. It reversed in In Re COTSAB. That is a standard thing that this court has within its toolkit to do when an opinion is as empty as this one and the PTO still hasn't pointed to an additional motivation to combine. And I'll just underscore, this is a real problem. We are seeing more and more of these opinions coming out of the PTAB in the last couple of years. It's just not fair. It's not fair to applicants. We could have amended in response to a more reasoned decision. It's not fair to this court. I mean, this court doesn't. Many of the cases you just cited, like when you're talking about, this is, is this, remind me, I just don't even remember, is this original prosecution or is this is not IPR? Yes. So wouldn't it be awfully strange? I mean, I don't think that we have the ability to order the patent office to issue a patent. I think they always have the right. All we can do is say they got it wrong. They always have the right to go back and continue prosecution. Well, I think we can figure this out. I think if there's any last word you need to give us on the merits of this case, that might be more. I understood your answer. So I'll just finish with one sentence. If these opinions are upheld, this is what you will see from the PTAB, even in original prosecutions. And this court will be in the position of having to decide obviousness instead of the agency. Thank you, Your Honor. I understand this dilemma.